THE STATE OF OHIO, APPELLEE, *v.* BRADEN, APPELLANT.

[Cite as *State v. Braden,* 98 Ohio St.3d 354, 2003-Ohio-1325.]

(No. 1999–1452—Submitted January 7, 2003—Decided April 2, 2003.)

O'CONNOR, J.

{¶ 1} In this appeal, defendant-appellant, David L. Braden, raises 15 propositions of law. Finding none meritorious, we affirm his convictions. We have independently weighed the aggravating circumstance in each count against the mitigating factors and compared his sentence to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm defendant's convictions and sentence of death.

{¶ 2} David L. Braden was distraught that his relationship with Denise Roberts might be ending. Roberts resided with her father, 83–year–old Ralph Heimlich, at his Columbus home. Heimlich thought that Braden was a "scumbag" and wanted Roberts to end her relationship with Braden.

{¶ 3} On August 3, 1998, Braden showed up at Roberts's workplace and argued with her in the parking lot. They continued to argue following dinner that evening, and Braden damaged Heimlich's car. Later that evening, Braden armed himself and went to Roberts's home. There, he shot Roberts once in the head, and he repeatedly shot Heimlich, killing them both. Braden was convicted of the aggravated murders of Roberts and Heimlich and sentenced to death.

{¶ 4} The evidence against Braden included testimony and videotape showing Braden arguing with Roberts at her place of employment, testimony that Braden brandished a pistol prior to the murders, Roberts's complaint filed with police an hour before the murders that Braden had "keyed" her father's car, testimony identifying Braden as the person leaving the crime scene, evidence that Braden did not return to his home until 45 minutes after the murders, and forensic

testimony that bullets removed from the victims' bodies were similar to bullets found at Braden's home.

## State's Case

{¶ 5} Shortly after 6:00 p.m. on August 3, 1998, Denise Roberts talked to Victoria Hauser, a co-worker at Merck–Medco in Columbus, about her personal life. According to Hauser, conflict between Braden and Roberts's father was ongoing. Roberts expressed her love for Braden, but Heimlich thought he was a "scumbag." After their conversation, Hauser "demanded that [Roberts] walk out with [her] and that [they] stop and talk with security on the way out" of the building.

{¶ 6} Braden was waiting at Merck–Medco to meet Roberts as she left work. Braden had arrived at Merck–Medco's entrance, had told the security guard he "was here to pick his girlfriend up," and had signed his name as "Joe Bob, visitor" on the visitor's log. Braden waited for a few minutes and then went outside.

{¶ 7} Roberts had spotted Braden's van in the Merck–Medco parking lot before she left the building, and she asked a security guard to "keep an eye on her as they walked out to their car because she didn't * * * know why her boyfriend was on the property." Roberts declined the security guard's offer for an escort to her car because "she was fearful that that would make [Braden] angry." However, parking lot surveillance cameras were directed on Braden's van, and a security vehicle followed Roberts and Hauser while they walked to Roberts's car.

{¶ 8} Braden pulled up his van to block Roberts and Hauser while they were walking towards the parking lot. Braden said, "Hi baby," and told Roberts that he wanted to talk to her. Roberts was "terrified." She told Braden that Hauser "was walking [her] to her car because Roberts had something in her car that she wanted to give Hauser." Braden told Roberts that "he would follow her to the car," and told Hauser to "get the fuck out of here, I want to talk to my girlfriend * * *."

{¶ 9} The guard in the security vehicle approached Braden after observing him talk to the two women. Upon being approached, Braden said, "What is this? What do I look like? I'm her boyfriend. Do I look like a murderer?" Roberts agreed that Braden was her boyfriend, and the security guard resumed driving around the parking lot to make sure there was no physical violence.

{¶ 10} Roberts drove Hauser back to the front of the building, and Hauser returned to work. Before leaving, Hauser told Roberts, "[P]lease come to my house, don't go home, don't get out of your car, don't talk to him, he's going to kill you." Surveillance footage shows that Braden and Roberts got out of their cars,

had an "intense" conversation, and then returned to their vehicles and left the parking lot.

{¶ 11} At approximately 7:30 p.m., Roberts was at Braden's home on Acton Road in Columbus. Shawn Craddock was visiting his mother, Braden's next-door neighbor, and heard Roberts and Braden arguing. Craddock overheard Braden say, "[T]his was bullshit," although he did not hear what else they said. Roberts was later heard getting into her car and pulling out of Braden's driveway.

{¶ 12} Sometime between 8:00 p.m. and 9:30 p.m., Roberts went to a police substation and reported that Braden had damaged her car. Officer Michael Tucker described her as "kind of hysterical" and said, "I could tell she had been crying because some of her makeup was running down her face a little bit." Roberts reported that "she had just gotten in an argument with her boyfriend and that he had keyed up her car." Roberts recounted events leading up to this incident, saying "that [Braden] had showed up at her work and that they had talked a little bit, and he had talked her into going to dinner. She * * * went back to his house, and they got into another argument. She said she got in her car, he wanted to get inside the car and couldn't, and that is when he scratched the car up."

{¶ 13} Officer Tucker did not take an incident report since the car was in her father's name. Roberts was advised to have her father call the police station and have a report taken then. After they had finished talking, Tucker viewed the damage, which "appeared to be scratch marks from * * * a key or something like that on the hood and on the side of the door and on top of the car." Roberts then returned home, and Officer Tucker drove "towards [Braden's] house, to see if [he] could either see him outside or * * *, maybe talk to him about it."

{¶ 14} Between 9:30 and 9:45 p.m., Craddock was backing his car out of his mother's driveway and saw Braden "standing in the center window * * * and it appeared * * * that he was pointing a gun at" Craddock. Craddock drove to the nearest pay phone and called the police. At around 10:00 p.m., Craddock called his mother, who said, "[H]e's just now leaving."

{¶ 15} After calling the police, Craddock pulled his van behind Officer Tucker's police cruiser as it was parked on Acton Road. Craddock reported that Braden had just pointed a firearm at him. He also reported that "he had trouble with [Braden] in the past, * * * [and] every time he gets into it with his girlfriend, he basically goes crazy."

{¶ 16} At 9:53 p.m., Roberts called Marion Orr, a police dispatcher, requesting that the police come to her home to take a report on Braden's "keying" of her father's car. Since this was not a high priority incident, the police did not immediately dispatch a cruiser to Heimlich's residence.

{¶ 17} Roberts and Heimlich lived on Barthel Road in east Columbus. Shortly after 10:00 p.m., Irvin Ringler II, who lived across the street, heard "five pops" sequenced as "three quick ones followed by a pause, and then another one, a pause, and then another pop." Ringler went outside and saw a man wearing a red shirt and blue jeans walking across a lawn. At the same time, Judith Gall, Heimlich's next door neighbor, heard noises that "sounded like a hammer hitting an aluminum garage door."

{¶ 18} At about the same time, Patricia Cooper, who also lived on Barthel Road, was picking up her dog at her mother's nearby home when she heard "popping sounds." As Cooper approached her house, she saw a man with a reddish shirt walking down Heimlich's driveway, and "his left hand was shielding his face with his face facing down to the ground."

{¶ 19} Charlotte Proctor, who lived across from Heimlich, also heard noise outside and went to investigate. Proctor noticed that all of Heimlich's exterior lights were on. After a few minutes, Proctor saw a man in a red tee-shirt and with a ponytail walk from the back of Heimlich's home, open and close the gate, walk down the street to a parked van, and drive away.

{¶ 20} Proctor and Gall discovered Roberts's and Heimlich's bodies after entering Heimlich's home through an open front door. Columbus police officers arrived at the scene after Proctor and Gall called 911.

{¶ 21} Police officers found Roberts's body lying towards the back of Heimlich's house near a box of spilled kitty litter. Heimlich's body was lying in the kitchen. The police found no sign of forced entry or evidence of theft in the house. Police found an expended .38 caliber nyclad-coated bullet on the living room floor and found a similar .38 caliber bullet lying on the kitchen floor near Heimlich's body. A nyclad-coated bullet is a lead bullet with a nylon coating over the lead surface. A firearms expert noted that out of 150 to 200 sets of bullets he examines in a given year, "no more than * * * five to ten" are nyclad-coated bullets.

{¶ 22} A telephone answering machine tape that was recovered from the crime scene revealed this message: "Denise, call me, please call me now, please call me now, please! This is David, please call me now!" Phone records showed that at 9:35 p.m. on August 3, 1998, a phone call was made from Braden's home phone to Roberts's home phone.

{¶ 23} Examination of Heimlich's car showed fresh scratches on the hood, roof, trunk, and passenger side of the vehicle. Police found fingerprints of Braden's left middle and left ring fingers on the right windshield pillar of the car.

{¶ 24} Neighbors provided the police with the suspect's description and identification of his blue van. Meanwhile, Orr heard reports on the police radio about the shooting deaths of two people on Barthel Road, and upon remembering

the earlier call from that address, provided police with Braden's name and address.

{¶ 25} Sometime after 10:30 p.m., a police helicopter flew over Braden's home looking for his blue van. The officer did not spot his blue van, and the helicopter continued to fly over Braden's house every fifteen minutes. At 11:31 p.m., the officer spotted the blue van parked outside Braden's home.

{¶ 26} At approximately 11:30 p.m., officers from the Columbus special weapons and tactics ("SWAT") team went to Braden's home. Braden's van was parked at the house, and the hood was warm, indicating that it had been running recently. Braden was spotted through a bathroom window in the back of the house toweling off after a shower.

{¶ 27} SWAT members took Braden into custody, but Braden did not act surprised when the police arrived. He appeared "very casual, very nonchalant," and he had wet hair. Braden's mother was in the house along with two dogs. Police secured the scene and began collecting evidence from Braden's home.

{¶ 28} Police found Braden's red shirt inside the washing machine. No firearms were found at either Heimlich's or Braden's home. However, police found a box containing 44 nyclad-coated .38 caliber bullets in Braden's bedroom desk. Six shells were missing from the box of 50 bullets.

{¶ 29} The police recovered white particles that appeared to be kitty litter from the driver's seat of Braden's van. However, no lab analysis was conducted to confirm that these particles were kitty litter.

{¶ 30} At approximately 2:30 a.m. on August 4, 1998, Proctor was escorted to Braden's home, where she identified Braden as the man she observed leaving Heimlich's residence. However, Proctor told police that "[s]he had a problem with his hairstyle viewing him on Acton. She stated that the individual she saw leaving Barthel had a ponytail at the time, and when she viewed the defendant at the Acton address, his hair was down, it was not in a ponytail."

{¶ 31} Dr. Keith Norton, a Franklin County Deputy Coroner, found that Roberts had died from a single gunshot to the head. Bullet fragments removed from Roberts's head were from a nyclad-coated .38 caliber bullet. According to Norton, Heimlich died from gunshot wounds to the chest, eye, and neck. Altogether, Heimlich was shot four times, and a fifth bullet may have grazed his shoulder. Heimlich had also been shot with nyclad-coated .38 caliber bullets.

## Defense Case

{¶ 32} The defense introduced hiking boots and shoes taken from Braden's home on August 3, 1998. Additionally, stipulated expert testimony and a lab

report were introduced showing that no blood was found on the hiking boots, shoes, socks, undershorts, pants, and shirt seized from Braden's residence.

## Trial Result

{¶ 33} A grand jury indicted Braden on two counts of aggravated murder. Count I charged Braden with the aggravated murder of Denise Roberts with prior calculation and design. Count II charged Braden with the aggravated murder of Ralph Heimlich with prior calculation and design. Both counts included a "course of conduct" death penalty specification pursuant to R.C. 2929.04(A)(5) and a firearms specification. The jury convicted Braden as charged and recommended the death penalty on each count. The trial court sentenced Braden to death on each count, three years' confinement on the firearms specifications, and a $50,000 fine.

{¶ 34} This cause is now before this court upon an appeal as of right.

## Pretrial Issues

{¶ 35} *Jury challenges.* In proposition of law XV, Braden argues that the trial court erred by overruling his challenge for cause against three prospective jurors who expressed strong views in favor of the death penalty. Braden complains that he was forced to use peremptory challenges against the three jurors and was thus unable to peremptorily excuse other jurors.

{¶ 36} A capital defendant may challenge for cause any prospective juror who, regardless of the evidence of aggravating and mitigating circumstances and in disregard of the jury instructions, will automatically vote for the death penalty. See *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492; *State v. Williams* (1997), 79 Ohio St.3d 1, 5–6, 679 N.E.2d 646; and *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. "A trial court's ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion." *Williams,* 79 Ohio St.3d at 8, 679 N.E.2d 646; *State v. Tyler* (1990), 50 Ohio St.3d 24, 31, 553 N.E.2d 576.

{¶ 37} First, Braden argues that prospective juror Michael Wallery, a parole officer, should have been excused for cause after telling the court that "if someone takes a life and it is a premeditated act, * * * they should pay with their life." The fact that Wallery was a parole officer did not disqualify him from sitting as a juror, and his other answers showed that he was open-minded and would fairly consider the evidence. See *State v. Murphy* (2001), 91 Ohio St.3d 516, 527, 747 N.E.2d 765 (police officer, who was not biased, permitted to sit as a capital juror). Wallery expressed his willingness to weigh the aggravating circumstances against mitigating factors, consider sentences other than death,

and follow the law even though it might differ from his personal views. Given these answers, the trial court did not abuse its discretion in rejecting the challenge for cause against Wallery.

{¶ 38} Second, Braden claims that prospective juror Sounia Ray, whose brother, the defense asserts, was a homicide victim, should have been excused after providing the following response to a question about life sentences: "It is not good enough. I mean, no. Why should he be able to live when he has taken two other people's lives?"

{¶ 39} The totality of Ray's answers during voir dire showed that she would be a fair-minded juror. She told the court that she would follow the law, that she would not automatically vote for the death penalty, and that she would weigh the aggravating circumstances against the mitigating factors. Ray disclosed that her brother was killed but that the assailant was found not guilty of murder at trial, and Ray was not disqualified. Ray assured the court that she could "put that aside," listen to the facts, and be a fair and impartial juror. See *State v. Allen* (1995), 73 Ohio St.3d 626, 629, 653 N.E.2d 675 (prospective juror whose brother was a homicide victim permitted to sit as capital juror after assuring the court she could set that aside and remain unbiased). We find that the trial court did not abuse its discretion in rejecting the challenge to Ray for cause.

{¶ 40} Finally, Braden asserts that prospective juror Robert Dumas should have been excused after providing an affirmative response to the question, "Do you believe that [a death sentence] is the sentence that you would jump to automatically upon finding of guilty beyond a reasonable doubt?" However, Dumas's other answers about the death penalty showed his commitment to being a fair-minded juror. During voir dire, Dumas agreed that he "would have to hear all the facts" before making a decision in the case, that he would "consider the alternatives," and that he would weigh the mitigating factors before reaching a sentence.

{¶ 41} The trial court also had the benefit of observing Dumas's demeanor and body language. The United States Supreme Court has reiterated that "deference must be paid to the trial judge who sees and hears the juror." *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841. Here, the trial court determined that Dumas could follow the law and be fair and impartial and stated, when overruling the challenge for cause, that "my view is this juror is one of the more thoughtful individuals that we have spoken with. I felt he followed the discussion better than most of the folks we have talked to." Thus, the trial court did not abuse its discretion in rejecting the challenge for cause against Dumas.

{¶ 42} Moreover, the trial court was sensitive to this issue and granted other defense challenges pursuant to *Morgan,* 504 U.S. 719, 112 S.Ct. 2222, 119

L.Ed.2d 492. Based upon our review of the record, we find that the trial court did not abuse its discretion in denying Braden's challenges for cause. We overrule proposition XV.

## Trial Issues

{¶ 43} *Alternate jurors in deliberations.* In proposition of law III, Braden argues that the trial court erred by permitting alternate jurors to remain in the jury room during both trial- and penalty-phase deliberations.

{¶ 44} Former Crim.R. 24(F), which was in effect at the time of Braden's trial, provided that "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict."[1] See former Crim.R. 24(F), 34 Ohio St.2d lxvii. Despite the clear language of former Crim.R. 24(F), the trial court sent the alternate jurors into the deliberation room during both phases of the trial.

{¶ 45} Prior to the guilt-phase deliberations, the trial court strictly commanded that the alternates "listen to the deliberations but * * * not participate under any circumstances in the deliberation unless and until, if ever, they are called upon to serve as a regular juror." Later, the trial court instructed the alternates, "[Y]ou really have to sit mute. * * * [The regular jurors] can't ask you about your recollection or the testimony or anything. They can ask you, but you can't answer. You can't indicate by body language or anything. I want you to really sit."

{¶ 46} Prior to the penalty-phase deliberations, the trial court instructed the alternates to "listen to the deliberations but * * * not, again, participate in any way." Later, the trial court stated that "the alternates really must sit mute. No verbal expressions to show agreement, no head nods, no nothing."

{¶ 47} The trial court "clearly erred" by "allowing the alternate jurors to remain present during deliberations." *State v. Jackson* (2001), 92 Ohio St.3d 436, 439, 751 N.E.2d 946. See, also, *Murphy,* 91 Ohio St.3d at 531, 747 N.E.2d 765. Braden contends that the court should presume prejudice, but this court has previously refused to presume prejudice when alternates have been allowed to remain present during jury deliberations in capital cases. See *Jackson,* 92 Ohio St.3d at 439, 751 N.E.2d 946.

{¶ 48} The instant case is distinguishable from *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061. In *Gross,* one or more alternate jurors inserted themselves into the actual deliberations through intrusive verbal participation, while other "alternates [were] throwing pens and thing[s]" during the

---

1. Crim.R. 24(F) was amended effective July 1, 2002. 96 Ohio St.3d XCIV–XCV.

deliberations. *Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 169. Moreover, Gross's trial counsel objected to the presence of the alternates during the sentencing deliberations. Under these circumstances, a plurality found reversible error because there was "specific evidence of active disruption of the deliberative process that [posed] a significant risk of affecting jury functions * * *." Id. at ¶ 137. Further, the trial court accepted the jury's verdict in *Gross* regarding the death sentence without making any attempt to cure the apparent error.

{¶ 49} Here, the defense did not object to the alternates' presence during either phase of the jury's deliberations and thus waived all but plain error. *United States v. Olano* (1993), 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508 (error in permitting alternate jurors to attend deliberations was not reversible error under the federal "plain error" standard).

{¶ 50} Applying the test for plain error, the record does not show that, *"but for* the [trial court's] error, the outcome of the trial *clearly would have been otherwise."* (Emphasis added.) *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Neither the conviction nor the death penalty resulted from the presence of the alternates. Nothing in the record suggests that the alternate jurors said anything or participated in any form during the jury's deliberations. Moreover, there is no indication from the record that the alternates in any way disobeyed the judge's instructions or that their presence chilled the deliberative process. Thus, although it was improper for the trial court to allow the alternate jurors to remain present during deliberations, plain error is absent.

{¶ 51} As an alternative argument, Braden claims that his counsel were ineffective by failing to object to the presence of alternate jurors in the jury room during deliberations. Reversal of convictions on ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 52} The record does not disclose why counsel did not object, and Braden has failed to demonstrate deficient performance. Moreover, Braden has failed to show prejudice, as *Strickland* requires. Thus, his counsel were not ineffective by failing to object to the presence of alternates in the jury room during deliberations. See *Murphy,* 91 Ohio St.3d at 540, 747 N.E.2d 765 (counsel not ineffective for failing to object to the alternates' presence in deliberations). For the foregoing reasons, we overrule proposition III.

{¶ 53} *Weight of the evidence.* In proposition of law VI, Braden challenges his convictions for aggravated murder as against the manifest weight of the evidence.

{¶ 54} In considering a manifest-weight claim, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. See, also, *State v. Lindsey* (2000), 87 Ohio St.3d 479, 483, 721 N.E.2d 995.

{¶ 55} Both direct and circumstantial evidence established Braden's guilt. On the day of the murders, testimony and videotape evidence showed Braden arguing with Roberts in the parking lot of her place of employment. Later that evening, Braden argued with Roberts at his house, and he damaged Heimlich's car. Shortly before the murders, Braden was seen brandishing a pistol. After neighbors heard shots, witnesses saw Braden leave the crime scene and drive away in his van. Shortly thereafter, police in a surveillance helicopter observed Braden's van parked outside his home, and he was arrested. Braden's motive for the murders resulted from Braden's breakup with Roberts and his ongoing conflict with Heimlich, who thought that Braden was a "scumbag."

{¶ 56} Despite this evidence, Braden contends that none of the state's witnesses could identify him as the person walking away from the murder scene. However, several of the victims' neighbors heard gunshots and observed a man matching Braden's description (man with a pony tail and wearing a red tee-shirt) leave the victims's home, walk down the street, and drive away in a van. Around 2:30 a.m. on August 4, just four hours after the murder, Proctor identified Braden as the man she saw leaving Heimlich's residence. Thus, contrary to Braden's assertions, eyewitness testimony identified him leaving the crime scene.

{¶ 57} Braden also argues that the murder weapon was never found, and no physical evidence seized from the crime scene linked him to the murders. Admittedly, the murder weapon was never found, but the two victims were shot with six nyclad-coated .38 caliber bullets. A box containing 44 nyclad-coated .38 caliber bullets seized from Braden's bedroom desk provided a direct link between Braden and the murder victims. Six shells were missing from the box of 50 bullets, and this matched the number of shots fired at the victims. Additionally, Roberts's telephone answering machine tape contained an urgent message from

Braden to Roberts pleading with her to "call me now." Phone records showed that Braden called Roberts's home phone shortly before the murders.

{¶ 58} Finally, Braden contends that there was no evidence seized from his home or his person directly linking him to the murders. There was, however, evidence linking him to the scene. This evidence included the box of nyclad-coated bullets and Braden's red shirt, which matched the description of the shirt the murderer was wearing. The police also recovered white particles that appeared to be kitty litter from the driver's seat of Braden's van. Roberts's body was found next to spilled kitty litter similar to the white particles found in Braden's van.

{¶ 59} Given the strength of both direct and circumstantial evidence, this case does not fall into the category of the " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541. We find that the jury neither lost its way nor created a manifest miscarriage of justice in convicting Braden of aggravated murder. We reject proposition VI.

{¶ 60} *Prior calculation and design.* In proposition of law VII, Braden challenges the sufficiency of the evidence to support the prior calculation and design charged in Counts I and II.

{¶ 61} There is no bright-line test to determine whether prior calculation and design are present. Rather, each case must be decided on a case-by-case basis. *State v. Taylor* (1997), 78 Ohio St.3d 15, 18–20, 676 N.E.2d 82. This court has held, "Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph three of the syllabus.

{¶ 62} Braden contends that under *Taylor*, 78 Ohio St.3d at 19, 676 N.E.2d 82, citing *State v. Jenkins* (1976), 48 Ohio App.2d 99, 102, 2 O.O.3d 73, 355 N.E.2d 825, three inquiries must be made before upholding findings that he killed Roberts and Heimlich with prior calculation and design: (1) whether the accused and victim knew each other, and, if so, whether their relationship was strained, (2) whether the accused gave thought or preparation to choosing a murder weapon or murder site, and (3) whether the act was drawn out as opposed to being an almost instantaneous eruption of events. A finding that these circumstances existed supports the conclusion that the crimes were committed with prior calculation and design. Braden acknowledges that these circumstances were established but still contends that prior calculation and design were not proven.

{¶ 63} First, Braden knew the victims well. Further, Roberts was ending her relationship with Braden, Braden was upset about it, and they had two arguments a few hours prior to the murders. Braden and Heimlich were hostile to each other. Heimlich thought Braden was a "scumbag," and Braden had "keyed" Heimlich's car a couple of hours before the murders.

{¶ 64} Second, the evidence shows Braden's deliberation and planning. During Braden and Roberts's parking-lot confrontation, Braden told the security guard, "I'm her boyfriend. Do I look like a murderer?" These comments made four hours before the murders eerily foretold Braden's murderous plans. Following the final argument, Braden took his loaded pistol, drove to Heimlich's residence, and parked his van a block or so from Heimlich's home to avoid notice. He then walked a short distance, entered Heimlich's residence, and shot the two victims. Clearly, the sufficiency of time and Braden's reflection and activity evidence that the crimes were committed with prior calculation and design. See *Jackson*, 92 Ohio St.3d at 441, 751 N.E.2d 946.

{¶ 65} Finally, these were not impulsive shootings. Braden fired five shots at Heimlich and killed Roberts with a single shot to the back of her head. See, e.g., *State v. Campbell* (2000), 90 Ohio St.3d 320, 330, 738 N.E.2d 1178 (firing shots into a victim's head at close range showed prior calculation and design). See, also, *State v. Goodwin* (1999), 84 Ohio St.3d 331, 343–345, 703 N.E.2d 1251. Thus, we find sufficient evidence supporting the jury's determination of prior calculation and design, and we reject proposition VII.

{¶ 66} ***Guilt-phase instructions.*** In proposition of law II, Braden claims that the trial court erred by refusing Braden's request for an instruction on voluntary manslaughter. Braden argues that he was entitled to this instruction because Roberts's desire to end their relationship, coupled with his fragile mental health, provoked the killings.

{¶ 67} R.C. 2903.03(A), which defines "voluntary manslaughter," provides, "No person, while under the influence of sudden passion or in a sudden fit of rage, *either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force*, shall knowingly cause the death of another * * *." (Emphasis added.)

{¶ 68} Voluntary manslaughter is considered an inferior degree of aggravated murder, since " 'its elements are * * * contained within the indicted offense, except for one or more additional mitigating elements.' " *State v. Benge* (1996), 75 Ohio St.3d 136, 140, 661 N.E.2d 1019, quoting *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph two of the syllabus. Before giving an instruction on voluntary manslaughter in a murder case, the trial court must determine "whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction." *State v. Shane*

(1992), 63 Ohio St.3d 630, 590 N.E.2d 272, paragraph one of the syllabus. The initial inquiry requires an objective standard: "For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." Id. at 635, 590 N.E.2d 272.

{¶ 69} Braden argues that Roberts provoked him when she ended their relationship. However, Roberts's breakup with Braden was not sufficient provocation to warrant an instruction on voluntary manslaughter. Rejecting a similar argument in *Shane*, 63 Ohio St.3d at 638, 590 N.E.2d 272, we held that the defendant was not sufficiently provoked to act under the influence of sudden passion or in a sudden fit of rage by his fiancee's words informing him of her sexual infidelity. We concluded that the victim did very little to provoke Shane and that "words alone" will not constitute sufficient provocation to incite the use of deadly force in most situations. Id., paragraph two of the syllabus.

{¶ 70} In the instant case, the facts show that Roberts did nothing to provoke Braden. Rather, Braden confronted Roberts in the parking lot, damaged Heimlich's car, called Roberts at home, and then drove to the victims' house and killed them. Moreover, Braden's act of killing his victims by shooting Heimlich five times and shooting Roberts in the back of the head demonstrate purposeful killing. See *State v. Carter* (2000), 89 Ohio St.3d 593, 602, 734 N.E.2d 345 (voluntary manslaughter instruction denied where the victim was stabbed 18 times).

{¶ 71} Braden argues that lesser provocation should be deemed sufficient to warrant a voluntary manslaughter instruction because he does not possess or use the rational thought processes of most people. Braden contends that he has suffered numerous life-long mental health problems, the loss of countless jobs, the recent denial of welfare and educational benefits, and the stress of caring for an elderly mother. Regardless, because the defense presented evidence about these problems only during the penalty phase of the trial, that evidence cannot be considered on this issue.

{¶ 72} Even assuming that Braden subjectively could be easily provoked to act under the influence of a sudden passion or in a sudden fit of rage, there still must be *serious provocation occasioned by the victim*. We reject this argument because nothing that Roberts did constituted "serious provocation." See *Shane*, 63 Ohio St.3d at 630, 638, 590 N.E.2d 272 (psychologist's testimony about defendant's propensity to be provoked insufficient to warrant instruction on voluntary manslaughter).

{¶ 73} Finally, Braden claims that Roberts provoked him after he damaged her car (i.e., made him angrier, upset that she might call the police, and worried she would not re-establish their relationship). We reject such a speculative argument.

{¶ 74} Alternatively, Braden claims that his counsel were ineffective by failing to introduce any evidence at the trial phase that could have bolstered a jury charge of voluntary manslaughter. Specifically, Braden claims that Dr. Burch's testimony about his mental health problems should have been presented to support his request for an instruction on voluntary manslaughter. However, that testimony was not sufficient evidence of provocation warranting an instruction on voluntary manslaughter. We find that Braden's counsel were not deficient. See *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. For the foregoing reasons, we overrule proposition II.

{¶ 75} In proposition of law VIII, Braden contends that the trial court's instructions improperly defined causation in terms of foreseeability in violation of *State v. Burchfield* (1993), 66 Ohio St.3d 261, 263, 611 N.E.2d 819. However, Braden failed to object to this instruction at trial and waived all but plain error. Crim.R. 30(A); *Long,* 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraphs one and two of the syllabus.

{¶ 76} We have recognized that the use of foreseeability language in instructions in murder cases is legally perilous. *Burchfield,* 66 Ohio St.3d at 263, 611 N.E.2d 819; *Goodwin,* 84 Ohio St.3d at 346, 703 N.E.2d 1251. However, "[t]he use of that [language] * * * does not require reversal where the instructions as a whole make clear that the jury must find purpose to kill in order to convict." *State v. Phillips* (1995), 74 Ohio St.3d 72, 100, 656 N.E.2d 643. Here, the trial court's instructions did make that clear. No plain error occurred, and we reject proposition VIII.

{¶ 77} In proposition of law XIV, Braden challenges the constitutionality of the instructions on reasonable doubt. Because Braden failed to object to these instructions at trial, he waived all but plain error. Crim.R. 30(A); *Long,* 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraphs one and two of the syllabus. The trial court's reasonable doubt instruction quoted the language in R.C. 2901.05(D). We have repeatedly affirmed the constitutionality of the statutory definition of reasonable doubt. See *State v. Jones* (2001), 91 Ohio St.3d 335, 347, 744 N.E.2d 1163; *State v. Hessler* (2000), 90 Ohio St.3d 108, 115, 734 N.E.2d 1237; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 594 N.E.2d 604. Thus, we reject proposition XIV.

## *Penalty–Phase Issues*

{¶ 78} *Penalty–phase instructions.* In proposition of law IX, Braden claims that the trial court's instructions called for a unanimous vote for a life sentence, thereby violating *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030. Braden objects to the following instruction: "You shall sentence the defendant to death only if you unanimously find by proof beyond a reasonable doubt, that the

aggravating circumstances outweigh the mitigating factors. If you do not so find, you shall consider either a sentence of life without parole eligibility, after serving twenty-five (25) full years of imprisonment, or a life sentence with parole eligibility after serving thirty (30) full years of imprisonment, or a sentence without parole eligibility." However, Braden did not object to these instructions at trial and waived all but plain error. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus, death sentence vacated on other grounds, *Williams v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156.

{¶ 79} In *Brooks,* the trial court charged the jury: " 'You are now required to determine *unanimously* that the death penalty is *inappropriate before* you can consider a life sentence.' " (Emphasis added.) *Brooks,* 75 Ohio St.3d at 159, 661 N.E.2d 1030. *Brooks* found error because the trial court's instructions conflicted with R.C. 2929.03(D)(2). Id at 160, 661 N.E.2d 1030.

{¶ 80} Here, the trial court's instructions and the defense counsel's closing argument ensured that there was no *Brooks* error. The defense counsel advised the jury during his summation, "[Y]ou are not required to determine unanimously that the death sentence is inappropriate before you consider the life sentences. I will say that again. That is an instruction you will receive by the court. You are not required to determine unanimously that the death sentence is inappropriate before you consider the life sentences." The trial court's voting instructions then advised the jury, "You are *not required to determine unanimously* that the death sentence is inappropriate before you can consider the life sentences." (Emphasis added.)

{¶ 81} Contrary to Braden's contentions, the jurors were not misled by instructions that a life sentence must be unanimous, since there were no such instructions. Rather, the trial court's instructions emphasized juror unanimity before returning a death verdict.

{¶ 82} Finally, Braden argues that the trial court erred by failing to give a "lone-juror" instruction. However, Braden did not request a lone-juror instruction at trial and thus waived all but plain error. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. Here, the court's instructions implicitly advised the jury that a single juror could prevent the death penalty. We find that the trial court's failure to give this instruction was not plain error, and we reject proposition IX.

{¶ 83} *Prosecutorial misconduct.* In proposition of law XI, Braden claims that the prosecutor committed prosecutorial misconduct during penalty-phase closing arguments. The test for prejudice in closing arguments is " 'whether the remarks were improper, and, if so, whether they prejudicially affected substantial rights of the defendant.' " *State v. Hessler,* 90 Ohio St.3d 108, 125, 734 N.E.2d

1237, quoting *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. However, Braden failed to object at trial to the arguments he now complains of and thus waived all but plain error. *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus, death penalty vacated on other grounds, *Wade v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3138, 57 L.Ed.2d 1157.

{¶ 84} First, Braden complains that the prosecutor misbehaved by comparing him to mass murderers and serial killers as follows: "But then let's draw this out a little more. Let's suppose he killed three people. Would that be significant? Would the mental problems be significant? Four, five, six people, when does it stop being significant? A whole stadium full of people, a whole school full of people, when does this stop being significant? Or should we draw the line at any people and say, look, you know, if you have got a problem, we have got people who deal with your problem."

{¶ 85} The prosecutor's mass-murder comparison was improper. It did not properly rebut any mitigating evidence or previous defense arguments. The case did not involve mass murders, and the comparison lacked relevance. However, the prosecutor's improper argument made no difference in the outcome of the trial in view of the proven aggravating circumstance and the lack of significant mitigating evidence. Cf. *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 360, 662 N.E.2d 311. Although error, we find that the prosecutor's brief remarks do not rise to the level of outcome-determinative plain error.

{¶ 86} Second, Braden argues that the prosecutor emphasized the nature and circumstances of the offense as if they were aggravating circumstances. Braden complains, for example, that the prosecutor's argument improperly emphasized that he committed this double homicide while the victims were in their home.

{¶ 87} This court has held, "It is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.'" *Wogenstahl*, 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph two of the syllabus. However, the prosecutor never asserted that the location of the crime was an aggravating factor, and the trial court correctly instructed the jury as to the precise aggravating circumstance. Furthermore, the court advised, "You may not consider the nature and circumstances of the crime as an aggravating circumstance." See *State v. Hill* (1996), 75 Ohio St.3d 195, 202, 661 N.E.2d 1068. The instruction was clear, and we can assume that the jury followed the trial court's instructions. *Wogenstahl*, 75 Ohio St.3d at 360, 662 N.E.2d 311. Thus, we reject this complaint.

{¶ 88} Finally, Braden complains that the prosecutor improperly argued that Braden's sanity should be treated as an aggravating circumstance by stating:

"You're weighing two things. You're weighing mitigating circumstances versus or mitigating factors versus aggravating circumstances. Aggravating, if a person has got a problem and he's not—you know, he's not insane."

{¶ 89} Review of the state's argument in its entirety shows that the prosecutor was not arguing that Braden's sanity was an aggravating circumstance. Rather, the prosecutor was simply arguing that the psychologist's testimony should be given little weight in mitigation. Thus, the prosecutor's remark was an isolated misstatement that did not convey the improper meaning that Braden suggests. *State v. Waddy* (1992), 63 Ohio St.3d 424, 436, 588 N.E.2d 819. Moreover, isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 646–647, 94 S.Ct. 1868, 40 L.Ed.2d 431. Again, the court's instructions clearly described the aggravating circumstance that the jury was to consider during deliberations. We find that the prosecutor's comments did not result in plain error, and we reject this complaint.

{¶ 90} In summary, we find no prosecutorial misconduct justifying reversal, and we overrule proposition XI.

### *Ineffective Assistance of Counsel*

{¶ 91} In propositions V and X, Braden argues that he received ineffective assistance of counsel. Reversal of a conviction for ineffective assistance of counsel "requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Strickland v. Washington,* 466 U.S. 668, 669, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 92} *Improper argument on penalty-phase voting procedures.* Braden complains that his counsel improperly argued that the jury must first decide whether to impose the death penalty before considering life-sentence options in violation of *Brooks,* 75 Ohio St.3d at 148, 661 N.E.2d 1030. Contrary to Braden's contentions, the record does not reflect that counsel made such an argument. After discussing life-sentencing options, counsel told the jury, "You are not required to determine unanimously that the death sentence is inappropriate before you consider the life sentences." This was a proper argument, and Braden's counsel was not deficient.

{¶ 93} *Failure to object to trial-phase voting instructions.* Braden argues that his counsel were ineffective by failing to object to voting instructions requiring the jury to unanimously find him not guilty of aggravated murder before considering the lesser included offense of murder. That claim lacks any merit. As to Count I, the trial court correctly instructed the jury, "If you find

that the state failed to prove prior calculation and design beyond a reasonable doubt, you must find the defendant not guilty of aggravated murder and consider the lesser offense of murder." The same instruction was given to the jury on Count II. See *State v. Stallings* (2000), 89 Ohio St.3d 280, 293, 731 N.E.2d 159.

{¶ 94} No improper "acquittal first" instructions were given. The court never instructed the jury that it must unanimously find Braden not guilty of aggravated murder before considering the lesser included offense of murder. See *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph three of the syllabus. We find that Braden's counsel were not deficient by failing to object to these instructions.

{¶ 95} *Failure to object to penalty-phase instructions.* Braden also argues that his counsel were ineffective for failing to object to an instruction that advised the jury to collectively weigh aggravating circumstances against the mitigating factors. Braden's argument lacks merit. The trial court charged the jury: "You are to weigh the aggravating circumstances which you have already found against any mitigating factors which you may find to exist. The penalty for each individual count may be assessed separately. Only the aggravating circumstance related to a given count may be considered in assessing a penalty for that count. The aggravated murders themselves are not aggravating circumstances."

{¶ 96} In a capital case, the jury is obligated to separately consider each count and separately weigh the aggravating circumstances or circumstance applicable to each count. See *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus. Although the trial court's instructions here initially referred to aggravating "circumstances," the court later clarified that there is only "one aggravating circumstance with each count." Moreover, the aggravating circumstance (i.e., multiple murder) was the same for each count. See *State v. Keith* (1997), 79 Ohio St.3d 514, 532, 684 N.E.2d 47. Thus, it was clear that the same aggravating circumstance was simply repeated in both counts. See *State v. Goodwin,* 84 Ohio St.3d at 348, 703 N.E.2d 1251.

{¶ 97} Taken as a whole, these jury instructions were not misleading and correctly set forth the standard. See *State v. Jackson,* 92 Ohio St.3d at 446–447, 751 N.E.2d 946. Thus, counsel were not deficient by failing to object to these instructions.

{¶ 98} *Reintroduction of trial-phase evidence.* Braden next argues that his counsel were ineffective by failing to object to the reintroduction of trial-phase evidence during the penalty phase. In fact, the record shows that Braden's counsel did object to the state's motion to reintroduce such evidence during the penalty phase. We summarily reject this complaint.

{¶ 99} *Failure to object to hearsay.* Braden also argues that his counsel were ineffective by failing to object to hearsay testimony. First, Braden claims

that counsel erred by not objecting to testimony that Roberts was afraid of him. On August 3, 1998, Hauser accompanied Roberts to her car because Braden was waiting for her in the parking lot. When asked if Roberts was happy to see Braden, Hauser testified that Roberts was "terrified." During later testimony, Hauser repeated that Roberts was "afraid of him."

{¶ 100} Hauser's testimony that Roberts was "terrified" or "afraid" was not hearsay, as the witness was stating her own impression of Roberts's emotions at the time. However, even if the witness had been relating Roberts's words, the statements would have been admissible as statements of the declarant's then-existing state of mind under Evid.R. 803(3). *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21–22, 514 N.E.2d 394. Thus, counsel were not ineffective by failing to object to Hauser's testimony.

{¶ 101} Second, Braden claims that his counsel were ineffective by failing to object to Officer Tucker's testimony that Roberts reported that Braden had "keyed" her car. On August 3, between 8:00 p.m. and 9:30 p.m., Roberts reported at a police substation that Braden had damaged her car. According to Officer Tucker, Roberts was "hysterical" and told him "that she had just gotten in an argument with her boyfriend and that he had keyed up her car." Contrary to Braden's assertions, his trial counsel did object to Tucker's testimony. Thus, this complaint lacks merit.

{¶ 102} As an alternative argument, Braden claims that the trial court erred by failing to sustain the defense objection to Roberts's hearsay statement. However, Roberts's statement was admissible as an excited utterance under Evid.R. 803(2).

{¶ 103} To be admissible under Evid.R. 803(2), a statement must concern " 'some occurrence startling enough to produce a nervous excitement in the declarant,' which occurrence the declarant had an opportunity to observe, and must be made 'before there had been time for such nervous excitement to lose a domination over his reflective faculties.' " *State v. Huertas* (1990), 51 Ohio St.3d 22, 31, 553 N.E.2d 1058, quoting *Potter v. Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, paragraph two of the syllabus. Here, Roberts observed Braden damaging her father's car, and she was still in an agitated state over the incident when she spoke to Officer Tucker. Thus, there was ample evidence to support the trial court's finding that the statement was admissible as an excited utterance.

{¶ 104} Finally, Braden argues that his counsel were ineffective by failing to object to parts of Officer Tucker's testimony. Tucker testified that after talking to Roberts about Braden's "keying" her father's car, Tucker drove towards Braden's house to talk with him. The testimony further recounted that Tucker had parked his cruiser a short distance from Braden's home, and Craddock pulled

his van behind the cruiser. Craddock was "upset, saying that his next-door neighbor had pointed a firearm at him." In further talking to Tucker, Craddock "stated that he had trouble with his next-door neighbor in the past, and stated that every time he gets into it with his girlfriend, he basically goes crazy."

{¶ 105} Craddock's statement that Braden pointed a firearm at him was admissible as an excited utterance under Evid.R. 803(2). Here, Craddock was reporting a startling event that had just occurred, and he was visibly upset when reporting the incident to Tucker. However, Craddock's comments about his past problems with Braden were not admissible under Evid.R. 803(2) because these comments appear to be the result of reflective thought. See *State v. Taylor* (1993), 66 Ohio St.3d 295, 303, 612 N.E.2d 316 (declarant's reflection on an event and giving a narrative account was the result of reflective thought and not an excited utterance).

{¶ 106} Even assuming that counsel erred, Braden does not show any reasonable probability that, but for his counsel's actions, the outcome of his case would have been different. *Bradley*, 42 Ohio St.3d at 143, 538 N.E.2d 373. Craddock testified as a prosecution witness that Braden had pointed a gun at him on the evening of August 3 and that he had seen Braden previously with a firearm "eight or nine times, ten times." Other evidence of Braden's erratic behavior during his arguments with Roberts negated any possibility that Craddock's comments affected the outcome of this case. Moreover, we find that compelling evidence of Braden's guilt eliminated any possible influence of Craddock's comments on the case's outcome. Therefore, we reject this claim of ineffective assistance.

{¶ 107} *Failure to conduct voir dire about the death penalty.* Braden also argues that his counsel were deficient by failing to fully question certain prospective jurors about their views on the death penalty or challenge them for cause.

{¶ 108} This court has recognized that " '[t]he conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked.' " *State v. Cornwell* (1999), 86 Ohio St.3d 560, 568, 715 N.E.2d 1144, quoting *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042. Moreover, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *Murphy*, 91 Ohio St.3d at 539, 747 N.E.2d 765.

{¶ 109} Braden complains that his counsel failed to probe deeper into Juror Joe Hess's views after Hess had expressed support for the death penalty for religious reasons. Hess indicated that his views favoring the death penalty originally came from his religious background. However, Hess emphasized that he did not "have any particular religious belief from that standpoint." In answer

to defense counsel's followup questions, Hess stated that he would be fair and impartial, would fairly evaluate defense psychological testimony as a matter in mitigation, and could consider lesser forms of punishment. Thus, counsel were not ineffective in questioning Hess.

{¶ 110} Similarly, Braden contends that since Juror Donald Fogle expressed strong views in favor of the death penalty, his counsel were deficient by asking Fogle questions limited to a page and a half of the transcript. The effectiveness of voir dire examination is not governed by its duration. Here, Fogle told defense counsel that he would be fair and impartial, would consider all of the evidence before making a determination on the sentence, and would not automatically leap to voting for death. Again, counsel's voir dire was not ineffective.

{¶ 111} Next, Braden complains that his counsel were deficient by asking no questions of Juror Terry Shiley despite Shiley's alleged predisposition to return a death verdict. Contrary to Braden's assertions, the record shows that his defense counsel asked Shiley numerous questions about his death-penalty views. Shiley told the defense counsel that he would consider mitigating factors in the case, that he would consider expert psychological testimony as possible mitigation, and that he would not automatically vote for the death penalty. We also reject this complaint.

{¶ 112} Prospective juror David Weisgerber was a Columbus police officer. Braden argues that his counsel was deficient by failing to review the witness list with Weisgerber to determine whether he was acquainted with any of the police officers who were scheduled to testify. We summarily overrule this complaint because the record shows that Weisgerber was questioned about the Columbus police officers on the witness list. Braden further argues that the prospective juror should have been challenged for cause. However, Weisgerber said that he could fairly consider all of the sentencing options. His occupation does not disqualify him from jury duty. *Murphy*, 91 Ohio St.3d at 527, 747 N.E.2d 765.

{¶ 113} *Failure to raise competency.* Braden argues that his counsel were deficient by failing to raise his competency to stand trial as an issue after the trial had begun. According to Braden, his counsel should have requested a competency hearing because Dr. Burch testified that Braden believed that he would not be tried because God would deliver him and noted that he was becoming more distrustful and dismissive of his lawyers.

{¶ 114} A defendant is legally incompetent if "incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense." R.C. 2945.37(G). Due process principles forbid subjecting a legally incompetent criminal defendant to trial. *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433.

{¶ 115} Braden's defense counsel were alert to the possibility of Braden's incompetence. At the beginning of the trial, Braden's counsel notified the trial court that "we felt there might be some mental deterioration * * * [and] requested Dr. Kate Burch, our psychologist * * * to inquire" into his competency. Consequently, Dr. Burch examined Braden on three different occasions (February 12, March 12, and April 19, 1999) to ensure his competence and concluded after conducting each evaluation that Braden was competent.

{¶ 116} Dr. Burch diagnosed Braden as suffering from paranoid schizophrenia, but this diagnosis is not synonymous with incompetence to stand trial. "A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 502 N.E.2d 1016.

{¶ 117} Moreover, the record reflects no behavior by Braden during trial that would suggest the lack of legal competency. During trial, Braden answered the trial court's questions about visits from Dr. Burch, expressed satisfaction with his counsel, told the judge he understood his appellate rights, said he did not want a presentence investigation and informed the court that he did not wish to make a statement prior to sentencing. See *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 164, 749 N.E.2d 226 (counsel's failure to raise competency is not evidence of deficient performance when neither psychologist nor psychiatrist found that the defendant lacked competence, and nothing in the defendant's behavior at trial suggested the lack of competence). Thus, we find that the defense counsel were not deficient by failing to request a competency hearing after the trial had begun.

{¶ 118} *Failure to develop expert testimony during mitigation.* Braden claims that his counsel were deficient by failing to develop Dr. Burch's testimony to show that his paranoid schizophrenia qualified as an R.C. 2929.04(B)(3) mitigating factor. According to Braden, his counsel also erred by eliciting testimony that Braden was sane at the time of the offenses while failing to explain the difference between legal insanity and the R.C. 2929.04(B)(3) mitigating factor. Braden argues that his counsel, by not developing this distinction, allowed the jury to conclude that Dr. Burch's testimony was irrelevant as a (B)(3) mitigating factor.

{¶ 119} The R.C. 2929.04(B)(3) mitigating factor applies where "at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law."

{¶ 120} Dr. Burch testified that Braden suffered from paranoid schizophrenia, was under great stress at the time of the offenses, and may have violently reacted to the stress he was under by committing these offenses. Subsequently, Braden's counsel argued that the R.C. 2929.04(B)(3) mitigating factor applied,

and the trial court instructed the jurors that they could consider evidence of Braden's mental illness a mitigating factor under R.C. 2929.04(B)(3). Thus, Braden's counsel succeeded in obtaining an R.C. 2929.04(B)(3) instruction for the jury's consideration.

{¶ 121} However, Braden argues that his counsel were ineffective by failing to elicit testimony from Dr. Burch that he lacked the substantial capacity to appreciate the criminality of his conduct and thus failed to trigger the language of R.C. 2929.04(B)(3). Because it is highly speculative whether Dr. Burch could have so testified, Braden's counsel were not ineffective for failing to pursue this line of questioning. Compare *State v. Hartman* (2001), 93 Ohio St.3d 274, 299, 754 N.E.2d 1150 (counsel not ineffective by failing to introduce DNA evidence because the results of the DNA examination may not have been favorable for the defense).

{¶ 122} Finally, we reject Braden's argument that the jury was misled by Dr. Burch's testimony about his sanity because Dr. Burch did not testify that Braden was sane at the time of the offenses.

{¶ 123} *Cumulative error.* Braden argues that even if his counsel's errors, by themselves, did not rise to the level of ineffective assistance of counsel, the cumulative effect of those errors necessitates reversal. Nevertheless, we find that Braden received a fair trial and any error was nonprejudicial. Moreover, "errors cannot become prejudicial by sheer weight of numbers." *State v. Hill,* 75 Ohio St.3d at 212, 661 N.E.2d 1068. Thus, we also reject this claim.

{¶ 124} In summary, we find that none of the allegations of ineffective assistance, even if true, resulted in prejudicial error depriving Braden of a fair trial. Accordingly, we overrule propositions V and X.

### Constitutional Issues

{¶ 125} In propositions of law I and XII, Braden argues that Ohio's death penalty statute violates the federal and Ohio Constitutions. We reject these claims. See *State v. Carter,* 89 Ohio St.3d at 607, 734 N.E.2d 345; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 168, 15 OBR 311, 473 N.E.2d 264.

{¶ 126} In proposition of law IV, Braden challenges the constitutionality of 1994 amendments of the Ohio Constitution that provide for the direct appeal of capital cases from common pleas courts to the Supreme Court of Ohio. However, his claim is without merit. See *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668, paragraph one of the syllabus; *Clemons,* 82 Ohio St.3d at 454, 696 N.E.2d 1009.

{¶ 127} In proposition of law XIII, Braden argues that Ohio's death penalty violates international agreements to which the United States is a party. We find

that this claim also lacks merit. *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484; *Phillips,* 74 Ohio St.3d at 103–104, 656 N.E.2d 643.

### Independent Sentence Evaluation

{¶ 128} *Aggravating circumstance.* The evidence established that Braden was properly convicted of the aggravated murders of both Roberts and Heimlich with prior calculation and design and of the "course of conduct" death penalty specification pursuant to R.C. 2929.04(A)(5).

{¶ 129} *Mitigation evidence.* Braden called five mitigation witnesses and submitted documentary evidence for the jury's consideration.

{¶ 130} John Pancake, the defendant's older brother, testified that Braden had a "pretty tough childhood." When Braden was three years old, their father left the family. Before Braden was born, an older sister had been killed by a car. The father "kind of had a nervous breakdown over it and proceeded to drink and * * * left us, * * * he couldn't deal with us." Their mother raised the family after their father left. She went to work and left Pancake and Braden with babysitters. Braden's mother is still alive but suffers from dementia.

{¶ 131} Braden did not graduate from high school but later earned a GED. Braden joined the Navy and was discharged in September 1978. Pancake noticed a difference in Braden's behavior following his return to Columbus. "He would get very agitated about things very easily." Braden often stated that people were out to get him, and he had difficulty holding a job because of problems in dealing with people at work.

{¶ 132} Braden lived with his mother and was her sole caretaker at the time of the murders. Eventually, Pancake became unwelcome at Braden's home. Braden felt that his brother was "plotting against him." Because Pancake had received a power of attorney from his mother, Braden thought that Pancake was taking money from her. Subsequently, Braden got a power of attorney from his mother and opened new accounts.

{¶ 133} Pancake and Braden had "some really good conversations" after he started receiving "good medication" in jail. However, Braden's medication was altered, and he "seemed to change again." Braden is also very religious and thinks he is "a prophet of God."

{¶ 134} Kimberly Pancake, the defendant's sister-in-law and John Pancake's wife, described Braden as a "very paranoid person." For example, Braden would call the Pancakes and accuse them of being "out to get him, trying to set him up."

{¶ 135} Karen Bader, a counselor with the Bureau of Vocational Rehabilitation, met with Braden during December 1997 to help him find gainful employment. Braden disclosed that he had a brain injury when he was in the Navy and

had been diagnosed with personality disorders and other depressive-type disorders. Braden had had 49 jobs over the last 20 years, and was then unemployed.

{¶ 136} Bader met Braden and Roberts in March 1998 to discuss Braden's employment and job-training options. Braden said it was very stressful taking care of his mother and that "at times she was verbally abusive to him." Braden was interested in a training program to be a network administrator for computers, and he visited a computer school. An instructor in the program felt that he would be successful and was impressed that Braden had taught himself computer skills at home.

{¶ 137} In May or June 1998, Braden was referred for counseling. Braden mentioned that "he had angry outbursts, difficulty controlling his temper, difficulty getting along with people." Braden's behavior fluctuated. According to Bader, Braden had "difficulty concentrating, difficulty keeping jobs, difficulty with people, and had felt like he had been in social isolation for so long, and he knew that things were bad."

{¶ 138} Before June 24, 1998, Braden was approved to take a program at a computer training center and was "very anxious to get to work." In July 1998, Braden's application for Social Security benefits was denied, adding to his problems because he needed income while training.

{¶ 139} Judith English, a case manager for a state program that provides home-care services for the low-income elderly, met with Braden, his mother, and Roberts at Braden's home on April 17, 1998. The home was "generally unkempt." Braden wanted to move out of the home, wanted his mother taken care of, and said that "he and Denise would be moving to their own place." On April 27, 1998, a determination was made that Braden's mother would require 24-hour supervision and should not be alone. Two days later, Braden told English that Roberts had moved into his home.

{¶ 140} On May 22, 1998, Braden told English that he was considering placing his mother in a nursing home. Braden said that "he was beginning school, and that Denise was looking for employment, and they didn't feel they could properly provide the 24-hour supervision."

{¶ 141} On July 21, 1998, English conducted her second in-home visit at Braden's residence. The home's appearance was "much improved." Braden stated that Roberts was living in the home with him two to three days a week. Because Braden was going to attend computer training school, he planned to drop his mother off in the morning at an adult daycare program and then pick her up at the end of the day.

{¶ 142} Dr. Kathleen Burch, a clinical psychologist, interviewed Braden, administered psychological testing, and reviewed Braden's records. Braden's

father was an alcoholic and abandoned the family when Braden was three. Thereafter, Braden's mother struggled to take care of the family.

{¶ 143} Braden had a "very difficult experience in school" that Dr. Burch "attributed largely to racial tensions, living in a poor neighborhood, going to school that was primarily black, and being one of the few white students in the school." Braden "left home at a fairly early age and went to Texas and worked for a carnival type of operation."

{¶ 144} Braden returned to Ohio and joined the Navy. Braden had a head injury in the Navy and claimed that this injury caused him a lot of difficulty in coping. Braden was discharged from the Navy before completing his term of enlistment and received a general discharge under honorable conditions. Braden was married when he was 23, but this marriage ended in divorce.

{¶ 145} Results of neuropsychological testing were equivocal, and there was inconsistent evidence of a brain injury. Burch concluded that Braden did not have any "neuro-psychological or cognitive impairments that would substantially impair his day-to-day functioning."

{¶ 146} Braden's Rorschach inkblot test and clinical interview suggested that Braden had a "paranoid personality disorder and major depression." Further psychological testing, including projective drawings and a thematic apperception test, made it clear that Braden was "beginning to express some paranoid delusions." Braden's delusions included his belief that he was a "prophet of God," and that "there were certain natural phenomenas [sic] such as weather-related phenomena, storms and so forth that were caused by God as a sign that God was going to help him in his case." Consequently, Burch conducted competency examinations but concluded that Braden was competent.

{¶ 147} In talking with Braden's family, Burch learned that Braden had had problems for many years. She also learned that Braden's father was "much more abusive than Mr. Braden had admitted * * *." According to Braden's sister-in-law, Braden's mother "told her that one day she came home and the father had done something so horrible to the boys that she filed for divorce the next day." Braden was also very suspicious of his neighbors and thought they were "trying to poison him, that they [were] spying on him, that they were harassing him and causing him trouble."

{¶ 148} Braden consistently said that he did not "really remember" the offenses. Braden "maintained that he remembered talking with [Roberts] that day and then going home and falling asleep, and the next thing he knew * * * he was on the TV."

{¶ 149} Burch examined numerous documents in evaluating Braden. In October 1995, the Department of Veteran Affairs ("VA") had determined that

Braden's psychiatric illness was not service-connected. However, the VA medical examination found "current evidence of recurrent major depression with psychotic features and dysthymia." Braden's Navy medical records showed that in 1978, he had suffered a head laceration that was treated with antiseptic and two sutures, but he suffered no loss of consciousness or dizziness as a result. According to Burch, the medical records contradicted Braden's claim that he suffered a much more significant injury.

{¶ 150} Braden was diagnosed as suffering from paranoid schizophrenia. Burch also testified that when "a person like that is under great stress, there is a potential for violence." Roberts's decision to end their relationship and the denial of benefits were very stressful events for Braden and may have played a role in these crimes.

{¶ 151} Braden feels that he does not have a mental illness and believes that his problems are the result of his Navy injury. However, according to Burch, Braden did not suffer an organic brain injury from the Navy accident, and his problems keeping a job and sustaining a relationship have nothing to do with this injury.

{¶ 152} During cross-examination, Burch mentioned that Braden "felt terrible that Denise was dead." Braden had told Burch that "Denise was a very good person, that he couldn't believe that this had happened, and was very sorrowful that she was gone." Burch did not conduct a sanity evaluation because "[Braden] hasn't talked about the offense, and there is no way for [her] to really tell that." However, Braden has "average intelligence."

### Sentence Evaluation

{¶ 153} We find nothing in the nature and circumstances of these offenses to be mitigating. As the trial court stated, Braden's murders of Roberts and Heimlich were the "calculated and selfish acts of a jilted lover." On August 3, 1998, Braden confronted his girlfriend in the parking lot at her job, continued to argue with her at his home, and damaged her father's car. Later that evening, Braden took a pistol that he kept in his bedroom, drove his van over to Roberts's home, and parked around the corner from Roberts's home where he would not be easily seen. Braden then entered Roberts's home, shot Heimlich five times, and shot Roberts once in the back of the head. The facts establish two senseless, horrific murders that lack any mitigating features.

{¶ 154} Braden's history, background, and character provide only modest mitigating value. Braden's father drank heavily after Braden's five-year-old sister was killed in an accident, and he eventually abandoned the family. Braden was raised by his mother, and she struggled to take care of her children. Braden dropped out of school, joined the Navy, suffered a head injury, and was

discharged after two years of service. After returning from the military, Braden was unable to maintain steady employment.

{¶ 155} Braden blamed his head injury from the Navy accident as the source of his problems in maintaining steady employment and sustaining relationships. However, Dr. Burch testified that Braden's head injury did not cause organic brain damage and was not related to his problems in keeping a job and getting along with people.

{¶ 156} The statutory mitigating factors are generally inapplicable, including R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(4) (youth of the offender—Braden was 38 at the time of the offense); or (B)(6) (accomplice only).

{¶ 157} The R.C. 2929.04(B)(5) mitigating factor, lack of a significant criminal record, is entitled to some weight because Braden has no "significant history of prior criminal convictions and delinquency adjudications."

{¶ 158} Braden's mental illness does not qualify as an R.C. 2929.04(B)(3) mitigating factor because there was no evidence that Braden's condition caused him to lack the "substantial capacity to appreciate the criminality" of his conduct. See *State v. Williams* (1995), 73 Ohio St.3d 153, 174, 652 N.E.2d 721 (paranoid schizophrenia not an R.C. 2929.04[B][3] factor absent testimony that the defendant lacked substantial capacity to appreciate the criminality of his conduct); *State v. Bradley*, 42 Ohio St.3d at 148, 538 N.E.2d 373 (chronic paranoid schizophrenia not an R.C. 2929.04[B][3] factor where no data supported a connection between the mental illness and the crimes).

{¶ 159} However, Braden's paranoid schizophrenia undoubtedly played a role in his crimes. Thus, we give some weight to Braden's lifelong mental illness as a mitigating "other factor" under R.C. 2929.04(B)(7). See *State v. Seiber* (1990), 56 Ohio St.3d 4, 9, 564 N.E.2d 408 (lifelong mental illness involving psychotic lapses and paranoid ideation was a mitigating "other factor").

{¶ 160} Braden's military service and his care of his mother for several years prior to these murders are additional R.C. 2929.04(B)(7) mitigating factors entitled to some weight. See *State v. Lawrence* (1989), 44 Ohio St.3d 24, 33, 541 N.E.2d 451.

{¶ 161} However, we find that the aggravating circumstance in each count outweighs the mitigating factors beyond a reasonable doubt. Undoubtedly, Braden's mental illness and the absence of a criminal record are entitled to significant weight in mitigation. When compared with the "course of conduct" aggravating circumstance, though, Braden's mitigating evidence pales in significance. Therefore, we find that the death sentence in this case is appropriate.

{¶ 162} Finally, we find that the death penalty imposed for the aggravated murders of Roberts and Heimlich is appropriate and proportionate when compared with other "course of conduct" murders. See *Tibbetts,* 92 Ohio St.3d at 174, 749 N.E.2d 226; *State v. Hessler,* 90 Ohio St.3d at 131, 734 N.E.2d 1237; *Cornwell,* 86 Ohio St.3d at 574, 715 N.E.2d 1144; *Clemons,* 82 Ohio St.3d at 456, 696 N.E.2d 1009; *State v. Awkal* (1996), 76 Ohio St.3d 324, 339–340, 667 N.E.2d 960; and *State v. Combs* (1991), 62 Ohio St.3d 278, 294, 581 N.E.2d 1071.

{¶ 163} Accordingly, we affirm the defendant's convictions and sentence of death.

Judgment affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, DONOFRIO and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., dissents.

GENE DONOFRIO, J., of the Seventh Appellate District, sitting for COOK, J.

---

**PFEIFER, J., dissenting.**

{¶ 164} I continue to believe that "allowing the alternate jurors to be present during jury deliberations violate[s] the sanctity of the jury process." *State v. Murphy* (2001), 91 Ohio St.3d 516, 564, 747 N.E.2d 765 (Pfeifer, J., dissenting), citing *United States v. Virginia Erection Corp.* (C.A.4, 1964), 335 F.2d 868, 872; see, also, *Koch v. Rist* (2000), 89 Ohio St.3d 250, 252, 730 N.E.2d 963, and *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 144 (Pfeifer, J., concurring in part and dissenting in part).

{¶ 165} As the majority states, the presence of alternate jurors during deliberations also violates Crim.R. 24(F). Unlike the majority, I do not believe we are constrained by the plain-error standard set forth in *United States v. Olano* (1993), 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508. *Olano* was decided based on the United States Supreme Court's analysis of the federal analogue to Crim.R. 24(F). We are free to analyze Crim.R. 24(F) independently.

{¶ 166} Like the civil trial in *Koch,* this case "involves extraordinary misconduct where a stranger to the jury entered the jury room and remained there throughout the entire deliberative process." *Koch,* 89 Ohio St.3d at 251, 730 N.E.2d 963. The four factors we identified in *Koch* (the presence of a stranger to the jury, the duration of the presence, the possibility of nonverbal communication, and the difficulty of determining whether the jury was prejudiced) are present in this case, but the stakes are higher, since this case involves a sentence of death. Id. at 252, 730 N.E.2d 963.

{¶ 167} I am unwilling to consider "errors that call into question the integrity of the jury's deliberations" harmless or subject them to plain-error analysis. See *Olano*, 507 U.S. at 743, 113 S.Ct. 1770, 123 L.Ed.2d 508 (Stevens, J., dissenting). The jury in a death-penalty case must be free from any perception that its fairness and integrity have been compromised. Here it is clear that nonjurors were allowed into the jury deliberations during both the guilt phase and the penalty phase. Their presence violated the sanctity of the jury's deliberations and therefore tainted the entire trial.

{¶ 168} Accordingly, I would reverse and remand for a new trial. I dissent.

---

Ron O'Brien, Franklin County Prosecuting Attorney, Joyce Anderson and Scott M. Forchand, Assistant Prosecuting Attorneys, for appellee.

W. Joseph Edwards and Brian J. Rigg, for appellant.