JOURNAL ENTRY AND OPINION
{¶ 1} J.P., a juvenile, appeals the trial court's determination that he is a delinquent for committing complicity to commit assault and unlawful restraint.[1]
 {¶ 2} On May 28, 2003, K.V. ("the victim"), [Pat], [Greg], and J.P. were in their high school's weight room working out. The victim made a joke aimed at J.P., who then approached the victim, and the two boys engaged in playful wrestling. According to the victim, J.P. then called to Greg and Pat to perform the "bandit" on the victim: as J.P. and Greg held the victim down, Pat inserted two fingers into the victim's anal cavity — an action known as the "bandit."
 {¶ 3} In juvenile court, Pat and Greg admitted to assault and unlawful restraint. J.P. proceeded to trial and was adjudged delinquent for his role in the assault upon the victim.
 {¶ 4} In this appeal, J.P. asserts two assignments of error, the first of which is:
"I. THE TRIAL COURT DENIED [J.P.] HIS RIGHT TO COMPULSORY PROCESS GUARANTEED TO HIM BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION WHEN IT FAILED TO CONTINUE THE TRIAL."
 {¶ 5} J.P. argues that he was denied due process because the trial court denied his motion to continue the trial. On the day of trial, two of J.P.'s subpoenaed witnesses failed to appear in court. Without the two witnesses, defendant claims he was denied a fair trial because he was unable to present an adequate defense.
 {¶ 6} Whether to grant or deny a motion to continue a trial is committed to the trial court's sound discretion. On appeal, the trial court's decision will not be disturbed absent an abuse of its discretion. In re Whitson, Allen App. No. 1-2000-52,140 Ohio App. 3d 409, 417, 2000-Ohio-1769, 747 N.E.2d 881. Further,
"[i]n determining whether the trial court has abused its discretion, appellate courts should apply a balancing test which takes cognizance of all the competing considerations.
* * *
"In evaluating a motion for a continuance, a court should note, inter alia: the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case. (Citations omitted)."
Id., citing State v. Unger (1981), 67 Ohio St.2d 65, 67-68,423 N.E.2d 1078.
 {¶ 7} In the case at bar, J.P.'s counsel issued two defense subpoenas: one for Tom Pavlica, an alleged eyewitness to the incident, and Steve Farnsworth, a school district employee who was expected to testify about J.P.'s school expulsion hearing. Under Unger, J.P. insists that he did nothing to contribute to the circumstances underlying the request for a continuance. The record, however, belies J.P.'s claim.
 {¶ 8} Just before trial was set to begin, defense counsel told the court that Pavlica and Farnsworth had not appeared. When the court asked whether counsel had telephoned either witness to see whether he was on his way, counsel responded: "No, I did not." Tr. 5. The following colloquy demonstrates that defense counsel knew well before trial that neither witness would appear to testify:
"THE COURT: Okay. We are going to get started. Maybe by the time we get through the case, the State's case, they'll be here. But you may want to get someone back at your office to make a call.
MR. STERKEL: It's my understanding the one gentleman just went on vacation, just left, went to Florida. It's also my understanding that the representative from the School Board went out of town, as well, even though he knew he was subpoenaed.
THE COURT: Mm-hmm.
MR. STERKEL: So they are not even in the — in the City to call them. And, you know, I need these guys here because they are part of our case.
The subpoenas were issued. We were here I believe on the 11th when we changed the date to today. The subpoenas were issued the following morning.
THE COURT: Mm-hmm.
MR. STERKEL: These people had more than ample time to get here. I understand that it's vacation time. I understand that it's Christmas break for some of these kids. But you know what, this is a trial and we are here today.
THE COURT: Mm-hmm. All right. Let's get —
MR. STERKEL: I don't want to be prejudiced by this.
THE COURT: I understand, sir. When did you find out they were not going to be available?
MR. STERKEL: This morning.
THE COURT: Did you talk to them after the subpoenas were issued?
MR. STERKEL: I spoke to the mother of the individual I subpoenaed, and she told me that he was going on vacation. I told her that, well, I am sympathetic to the fact that you are going on vacation. I said this is — I can't tell you don't — abide — abide by the subpoena. The subpoena takes precedent over the vacation. I said, I certainly understand you're going to Florida, whatever —
THE COURT: Mm-hmm.
MR. STERKEL: — but, you know, that's not an excuse. I also got a motion in the mail from — I don't remember the attorney's name who was representing the School Board, wanting to quash the subpoena and suggesting that we get together yesterday to have a deposition of this gentleman.
Well, I'm not going to have a deposition the day before the trial and put some finishing touches on things, and that's when it was convenient for him to make himself available.
You know, so, yeah, I had some indication that they weren't going to come. But I did speak to the mother. And when I got the Motion in the mail, that came in on — I believe I picked it up on Saturday.
THE COURT: Mm-hmm.
MR. STERKEL: — when I was in the office. I did not have an opportunity to call her on Saturday. I didn't call her yesterday because I was preparing with my client.
THE COURT: Mm-hmm.
MR. STERKEL: — putting some finishing touches on things.
THE COURT: Mm-hmm.
MR. STERKEL: And I wasn't — we weren't able to have a deposition of him yesterday, anyways, even if we wanted to. I just couldn't do it.
THE COURT: Mm-hmm.
MR. STERKEL: So I mean, again, while I'm sympathetic to these guys and the fact they've got vacation plans or whatever the case may be, I don't think that trumps the fact that the Court has ordered a trial and a subpoena has been duly served on them and they're choosing to ignore it."
Tr. 5-8.
 {¶ 9} The court denied defense counsel's request to continue the trial date, but not before counsel acknowledged that, once he realized neither witness would appear at trial, he still did nothing to preserve either witness's testimony through a deposition.
 {¶ 10} At the end of the case for the defense, J.P.'s counsel again requested a continuance so that he could produce Pavlica and Farnsworth as part of his case. At this point, the court learned that defense counsel had known for at least two weeks that Pavlica would be unavailable on the date of trial. Tr. 371.
 {¶ 11} As to Farnsworth, J.P. argued that he was an important witness because he attended J.P.'s expulsion hearing. According to J.P., Farnsworth would testify about facts established in the hearing and the school's subsequent decision not to expel J.P. for misconduct related to the "bandit" incident.
 {¶ 12} The court reminded J.P. that the state had already stipulated to defense Exhibit "A"; the school's letter stating that J.P. would not be expelled for anything related to this incident.
 {¶ 13} The court also reminded J.P. and his counsel that even if Farnsworth had honored the subpoena, he still could not testify about what he heard during the expulsion hearing. The court informed J.P. that, because the parties had stipulated to Exhibit "A," Farnsworth's testimony either would be deemed not relevant or would constitute inadmissible hearsay. The trial court noted that, as with Pavlica, defense counsel had done nothing to preserve Farnsworth's testimony before trial.
 {¶ 14} The trial court stated that defense counsel "had an obligation as counsel * * * to take whatever steps necessary to preserve the testimony of any witness that might be unavailable." Tr. 378. The court further noted that defense counsel never provided any notice before trial that there was a problem with any of his witnesses. Tr. 380.
 {¶ 15} The record establishes that J.P. had already been granted one other trial continuance and that, although he knew neither Pavlica nor Farnsworth was going to appear at trial, J.P. did nothing to preserve the testimony of either witness. On these facts, we conclude that J.P.'s witness problem was of his own making.
 {¶ 16} Under the doctrine of invited error, a party is not entitled to take advantage of an error that he himself invited or induced the court to make. In re M.W., Cuyahoga App. No. 83390, 2005-Ohio-1302, at ¶ 58,[2] citing State v. Campbell,90 Ohio St.3d 320, 324, 2000-Ohio-183,738 N.E.2d 1178.
 {¶ 17} Because of defense counsel's conduct, we conclude that he invited and helped create the problem with his own two witnesses. For these reasons, we find no abuse of discretion in the trial court's decision to deny J.P.'s motion to continue his trial. J.P.'s first assignment of error is overruled.
"II. The trial court's finding of delinquency was against the manifest weight of the evidence."
 {¶ 18} J.P. maintains that the judge's finding of delinquency was against the manifest weight of the evidence.
 {¶ 19} In a juvenile matter, a manifest weight claim is subject to the same standard of appellate review as in a criminal case. In re B.B.,
Cuyahoga App. No. 81948, 2003-Ohio-5920, at ¶ 27, citing State v.Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541.
"In considering a manifest-weight claim, a court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way, and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."
 {¶ 20} State v. Braden, 98 Ohio St.3d 354, 2003-Ohio-1325,785 N.E.2d 439, at ¶ 54; In re J.K., Cuyahoga App. No. 82824, 2004-Ohio-1792, at ¶ 9.
 {¶ 21} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony." Thompkins, at 387, citing Tibbs v. Florida (1982), 457 U.S. 31, at 42.
 {¶ 22} In the case at bar, the trial court adjudicated J.P. a delinquent because he was convicted of complicity to commit assault in violation of R.C. 2923.03(A)(2) and R.C. 2903.13(A). J.P. was also convicted of unlawful restraint in violation of R.C. 2905.03.
 {¶ 23} R.C. 2903.13(A) defines assault as follows:
(A) No person shall knowingly cause or attempt to cause physical harm to another * * *.
 {¶ 24} R.C. 2923.03 defines the offense of complicity as follows:
(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
* * *
(2) Aid or abet another in committing the offense * * *.
 {¶ 25} To aid or abet in the commission of an offense means
that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.
* * *
"participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed."State v. Pruett (1971), 28 Ohio App. 2d 29, 34, 57 Ohio Op.2d 38, 41, 273 N.E.2d 884, 887."
State v. Johnson (2001), 93 Ohio St.3d 240, 245-246, 754 N.E.2d 796.
Simply being present at the scene of a crime, however, is not sufficient to prove someone was aiding and abetting in the commission of an offense. Id., at 243,[3] citing State v. Widner (1982),69 Ohio St.2d 267, 269, 431 N.E.2d 1025, 1027.
 {¶ 26} J.P. was also convicted of unlawful restraint as defined in R.C. 2905.03(A):
"(A) No person, without privilege to do so, shall knowingly restrain another of his liberty."
 {¶ 27} In the case at bar, the state presented several witnesses, including the victim, K.V. The victim testified as follows: he was in the school weight room on May 28, 2003. J.P. was working out in the weight room with him when the victim made an innocent joke directed at J.P.J.P. then came toward him and they playfully wrestled until J.P. yelled for two other juveniles, [Pat] and [Greg], to come over and give the victim "the bandit." Tr. 30.
 {¶ 28} The victim was asked what happened next:
"A: He grabbed my left — [J.P.] grabbed my left side and Greg grabbed my right side, and then they rolled me over, and then Pat stuck his two fingers in my butt.
Q: Now, when you say that — [J.P.] grabbed your left side?
A: Yes.
Q: And Greg grabbed your right side?
A: Yes.
* * *
Q: * * * Now, you're laying down. What exactly happens next after you lay down?
A: They rolled me over to my right side and Pat reached over and he stuck two fingers in my butt.
Q: Okay. You say he reached over. Were all three of these boys in front of you?
A: They were two on one side — two on one — two on my right and one on my left.
* * *
Q: Who is — Who is the one person that was on the other side?
A: [J.P.]
Q: So [J.P.] was on the one side and Greg and Pat were on the other side.
A: Yes.
Q: Okay. Were all three of them holding you down?
A: Well, Greg and Pat were up — Greg and [J.P.] were holding me down and Pat did it.
Q: And Pat just reached over?
A: Yes.
Q: How long you — would you estimate this entire episode lasted?
A: Twenty, thirty seconds.
* * *
Q: Okay. Did you notice any — Was there anybody else standing around right by the decline bench at this particular time?
A: Ryan Clement.
* * *
Q: Okay. Do you recall anybody else — the names of anybody else that was in there?
A: Mikey Cimaglia, Tom Pavlica —
* * *
Q: All right. Now, you say this entire incident lasted about 30 seconds?
A: Yes.
Q: Do you recall at any time any one of these individuals, [Pat], [Greg], or [J.P.] walking away —
A: No.
Q: — before the incident was over?
A: No.
Q: [Greg] kept holding you down?
A: Yes.
Q: And did [J.P.] keep holding you down?
A: Yes.
Q: Could you get away from them at all?
A: No.
* * *
Q: Once again, you're absolutely sure that both [Greg] and [J.P.] held you down?
A: Yes.
Q: Okay. And do you know whether [J.P.] walked away before this incident was totally over with?
A: No.
Q: Okay. No, you don't know, or no, he didn't?
A: He did not.
* * *
Q: * * * How was [J.P.] holding you?
A: He grabbed my elbow and like my thigh area, so I couldn't move my legs or my arm, and he rolled me on my side.
* * *
Q: * * * Were you able to free yourself?
A: No."
Tr. 29-34, 44-53.
 {¶ 29} Defense counsel argues that the victim's testimony during cross-examination establishes the possibility that the victim was mistaken about J.P.'s role in the "bandit" incident. We disagree.
 {¶ 30} The victim stated that, when he felt the two fingers, he closed his eyes. He was certain, however, that "six hands" held him, that only Pat, Greg and J.P. were around him, and that J.P. held him. Tr. 80. He was also certain that it was J.P. who called out to Pat and Greg to perform the "bandit." Tr. 90.
 {¶ 31} Defense counsel further argues that reasonable doubt exists because several of the state's witnesses recanted their initial identification of J.P. as one of the people involved in the incident on May 28.
 {¶ 32} Ryan Clement was able to confirm part of the victim's testimony about the weight room incident. Clement stated that he observed the victim and J.P. joking around and then playfully wrestling. He remembered Greg and Pat coming over to where J.P. and the victim were. Beyond this testimony, however, Clement admits that he made two contradictory written statements: State's Exhibit 11 is the written statement he made in the school principal's office shortly after the May 28 incident and State's Exhibit 12 is an e-mail he sent to defense counsel.
 {¶ 33} During direct examination, Clement testified that he could not remember whether J.P. was involved in the incident with the victim. When asked about Exhibit 11, in which he had written that "[J.P.] held him down while Pat was giving him the bandit," Clement said that this statement was incorrect and that he was now unsure whether J.P. was actually involved while Pat administered the "bandit." Tr. 131-132, 157, 164.
 {¶ 34} Clement also acknowledged he wrote an e-mail (Exhibit 12), in which he denied that J.P. was involved in the "bandit" incident. When questioned about the e-mail on cross-examination, however, Clement stated that he was not sure what happened that day or what J.P.'s involvement was.
 {¶ 35} The victim's mother testified that Clement came to their home two weeks before trial. While there, Clement apologized for writing the e-mail to J.P.'s attorney and said he felt pressured to write it. Clement then told the victim's mother that J.P. was in fact holding down the victim during the incident. Tr. 182-3.
 {¶ 36} Greg acknowledged that he had made a statement to police shortly after the incident occurred. In that written statement, he told police that he and J.P. held the victim down while Pat administered the "bandit." However, during defense counsel's cross-examination, Greg stated that J.P. had left the area before the incident rape occurred.
 {¶ 37} After J.P.'s trial concluded, the trial judge made the following statements about the contradictory witness statements:
"Certainly I do know that statements — some of the written statements vary from the oral testimony today, but I looked at the statements very carefully, took note of when they were written, the circumstances under which they were written, and compared those to — to the testimony that was presented today. * * * But I looked at the case and I looked at the evidence and considered it solely on the basis of what was presented today before the Court, not on the basis of anything that may have been written in any newspaper * * *. * * * I do believe that there is some validity in considering the statements made by various witnesses in close proximity to the time the event occurred in May — on or about May 28th of 2003.
Clearly there was — there were discrepancies in testimony presented today, (inaudible) that the testimony was sometimes all over the place, but there were, however, reliable statements made back in June of this year.
And also the Court has found that certain of the witnesses did present really credible testimony today. * * * And while * * * while the Court is certainly satisfied that — that [J.P.] did not insert his fingers in the victim's — in the victim's anus, the Court is satisfied and persuaded by the evidence that [J.P.] did aid and abet the conduct of others."
Tr. 417-420.
 {¶ 38} "A reviewing court will not reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the prosecutor proved the offense beyond a reasonable doubt." State v.Haywood, Cuyahoga App. No. 84874, 2005-Ohio-1856, at ¶ 18. Further, "the trier of fact is in a better position to observe the demeanor of the witnesses and weigh their credibility." Id., at ¶ 19.
 {¶ 39} Standing alone, the victim's testimony establishes J.P.'s guilt. That testimony establishes that J.P. was the only person who told Pat and Greg to perform "the bandit" on the victim and that immediately following J.P.'s request, J.P. and Greg held the victim down and Pat proceeded to put his fingers in the victim's anal cavity. From the victim's testimony, a fact finder could conclude that J.P. not only initiated that illegal act by his words of incitement and/or encouragement, but also assisted in the commission of that offense by holding the victim down while Pat forcefully violated him.
 {¶ 40} Moreover, when we resolve the conflicts in the evidence, namely the differing accounts Clement and Greg gave shortly after the incident and what they said at trial, we still conclude that the state met its burden of proof.
 {¶ 41} Approximately one week after the incident in the weight room, the school principal asked Clement to make a written statement describing what he recalled about the incident on the 28th. In that statement,[4]
Clement stated that J.P. and Greg turned the victim over and held him down. J.P. and Pat decided to give the victim the "bandit." Clement said he believed that Greg also came over and helped turn the victim "and held him down, along with" J.P. Clement then recounted that Pat took his fingers and stuck them in [the victim's] butt."
 {¶ 42} In August, however, Clement wrote a different version in an e-mail letter[5] to J.P.'s attorney. In that letter, he said that his first statement on June 5 was incorrect and that after thinking about what occurred, "[J.P.] was not involved in this incident * * *"; J.P. was not part of this "hazing." Rather, "he was just standing off to the side, as this took place." When asked at trial about what he said in the letter about J.P.'s role, he repeatedly said he was "unsure" or "unclear" because everything happened so quickly. Tr. 131-2. When the Court asked Clement whether anyone asked him to write this letter, Clement answered, "Mr. Sterkel said he would give me some time to think about — He said just think about what you recall, and if you wish, you could write a letter." It would not be unreasonable for the trial judge to conclude that Clement wrote the second statement only at the suggestion of defense counsel. Tr. 134.
 {¶ 43} Clement further admitted that he went to speak to the victim's parents shortly before trial and he apologized for writing the letter to defense counsel. When asked why he apologized, Clement answered: "Because I wrote in the letter that [J.P.] had nothing to do with it, when I should have said I was unclear about what happened." He added: "I honestly don't remember what took place." Tr. 119.
 {¶ 44} Greg also gave contradictory accounts of what occurred in the weight room. At trial, he said that J.P. walked away before the "bandit" incident occurred. Greg acknowledged that a week after the incident he made a written statement to police[6] in which he stated that J.P. called Pat to show him the "bandit" and then he and J.P. held the victim down while Pat performed the "bandit." Tr. 232. When asked whether he remembered his written statement, Greg acknowledged his signature on the statement and further explained that the officer told him: "You can change the statement later." Tr. 198 and 232.
 {¶ 45} Greg also changed his statement describing what a "bandit" was. At trial he said, "it is putting pressure on the tailbone by the buttocks." Tr. 199. When defense counsel told Greg his statement to police described the "bandit" as inserting fingers into an anus and questioned him about the difference in his[7] description, Greg explained, "I was under intense pressure." Tr. 200.
 {¶ 46} Greg also admitted he wrote an earlier statement at the request of an assistant school principal, also a week after the incident. In the school statement, Greg did not mention J.P., but said he "helped hold down" [the victim] while the "bandit" was administered. When asked why this statement, made shortly after the "bandit" incident, contradicted his trial testimony, he stated that he was under pressure at school also. J.P. explained that the assistant principal told him he was "involved with a rape," told him to "write down about the incident that happened last week," and then left the room. J.P. said, "I wrote down what I had thought at the time from what I could recall." Tr. 227.
 {¶ 47} It is not credible that pressure — both from the police and also from the assistant school principal — prevented Greg from accurately describing J.P.'s role. The only pressure Greg described regarding his school statement was the fear of being involved in a rape and that pressure allegedly caused the inaccuracies in his school statement. The differences between his school statement and his court testimony, however, did not erase his involvement; he continued to admit holding the victim down. It is only his account of J.P.'s role that changed, and that difference cannot be explained by his personal fear of being involved in a rape.
 {¶ 48} Neither Clement nor Greg offered any further clarification as to why their written statements implicating J.P. contradicted their trial testimony. Neither witness provided a credible explanation of why their written statements, made shortly after the incident were less reliable than their recollection at the time of trial, approximately seven months later in December 2003. In other words, their testimony did not create any reasonable doubt of J.P.'s guilt.
 {¶ 49} After reviewing the entire record, weighing the evidence, considering the credibility of the witnesses, and resolving conflicts in the evidence, we conclude that the State proved beyond a reasonable doubt that J.P. committed assault against the victim K.V. by knowingly causing or attempting to cause physical harm to him. The evidence also supports J.P.'s conviction for the offense of complicity because he aided and/or abetted Pat in committing the assault and unlawfully restrained the victim during the illegal act.
 {¶ 50} On this record, we cannot say that the trial court lost its way. The trial court's delinquency judgment, therefore, is not against the manifest weight of the evidence. J.P.'s second assignment of error is overruled.
Judgment accordingly.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Juvenile Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Cooney, P.J., and Gallagher, J., concur.
[1] J.P. was charged with delinquency by the commission of rape (Count 1); kidnapping (Count 2); assault (Count 3); sexual imposition (Count 4); and unlawful restraint (Count 5).
[2] A related proceeding is found in In re M.W., Cuyahoga App. No. 83409, 2005-Ohio-1305.
[3] "This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission." Id.
[4] State's Exhibit 11.
[5] State's Exhibit 12.
[6] State's Exhibit 13.
[7] State's Exhibit 14.